DGB

FILED

JUN 0 2 2023

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-167

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL INFORMATION
)
NATOSIA JEROME JENKINS )

The United States Attorney charges the following:

**INTRODUCTORY ALLEGATIONS**

1. From in or about February 2021 to in or about November 2021, Defendant NATOSIA JEROME JENKINS and others, known and unknown to the United States Attorney, conspired to defraud the United States Government in the name of at least two companies he owned controlled. This scheme involved frauds upon institutions and agencies engaged to provide financial assistance to the public arising from the COVID-19 pandemic.

2. At all times relevant to this Information, JENKINS was a resident of the Eastern District of North Carolina.

**COVID Fraud: The Paycheck Protection Program ("PPP")**

3. In March 2020, Congress passed the Coronavirus Aid, Relief, and

1

Economic Security (CARES) Act, which was designed to provide emergency financial assistance to millions of Americans who were suffering from the economic effects caused by the COVID-19 pandemic.

4. The United States Small Business Administration (SBA) was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small business and by assisting in the economic recovery of communities after disasters.

5. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program (PPP). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

6. To obtain a PPP loan, businesses were required to submit a PPP loan application, signed by an authorized representative of the business, acknowledging the program rules. The business was required to state (a) its average monthly payroll expenses and (b) the number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

7. A PPP loan application was required to be processed by a participating

financial institution ("Lender"). Many Lenders constituted financial institutions, as that term is defined in Title 18, United States Code, Section 20. If a PPP loan application was approved, the Lender funded the PPP loan using its own moneys, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the Lender to the SBA in the course of processing the loan.

8. PPP loan proceeds were required to be used by businesses on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities. Loans provided through the PPP have government-backed guarantees and are 100% forgivable if the borrower submits documentation to the PPP Lender and SBA demonstrating that at least sixty percent (60%) of the PPP loan proceeds were utilized to meet existing payroll obligations and to retain employees.

9. Funds disbursed under the PPP and other programs are referred to collectively herein as "COVID Loans."

### The Scheme to Defraud

10. From in or about February 2021 to in or about November 2021, the Defendant, NATOSIA JEROME JENKINS (hereinafter "JENKINS") conspired with E.W., S.C., and others to engage in a fraud upon the United States and the SBA. JENKINS engaged in fraud upon the PPP program in the name of Jenkin's Cleaning Service, Inc. and Triangle Property Group, Inc., which were both owned and

controlled by JENKINS. Both JENKINS and his two companies were located in the Eastern District of North Carolina.

11. E.W. assisted numerous other companies and individuals (collectively "Borrowers") located around the country to fraudulently obtain COVID Loans. In exchange for their assistance in obtaining COVID Loans, the Borrowers such as JENKINS paid E.W. a fee. In total, E.W. and their spouse, S.C., collectively facilitated the fraudulent disbursement of more than $15 Million in COVID Loans.

12. To promote the operation of the scheme, E.W. and S.C. utilized middlemen to recruit Borrowers. E.W. and S.C. paid, and caused others to pay, these middlemen a "cut" of the fee charged for securing the fraudulent loans for the Borrowers.

13. Q.J. was one such individual who operated various companies in the Eastern District of North Carolina. Q.J. was a Borrower who utilized E.W. and S.C. to fraudulently obtain PPP loan proceeds in the names of several companies. In addition to being a Borrower, Q.J. also served as a middleman, and recruited additional Borrowers directly or indirectly—including Defendant JENKINS—for E.W. and S.C. for an agreed upon fee.

14. To carry out the scheme, the conspirators engaged in the following series of steps:

    a. E.W. came into contact with JENKINS—a Borrower who desired to obtain PPP loans—by introduction from Q.J., acting as a middleman.

4

JENKINS and E.W. communicated through interstate text messages, phone calls, and emails. During these contacts, E.W. and JENKINS discussed the process by which E.W. would assist JENKINS to secure PPP loans.

b. JENKINS supplied E.W. with various information concerning JENKINS and his companies, which would be used to obtain the PPP loans, such as their federal tax identification numbers and payroll information for the prior year. JENKINS also supplied personal information, such as a driver's license and social security card. JENKINS also provided bank account information for the companies, including the account numbers and routing information.

c. E.W. and S.C. used the information supplied by JENKINS to fraudulently apply for the PPP loans. In furtherance of the application, E.W. created documents that falsely reflected such information as the annual payroll, gross receipts, expenses, number of employees, and employee names for Jenkin's Cleaning Service, Inc. and Triangle Property Group, Inc.

d. E.W. and S.C. then supplied fraudulent documents to JENKINS via interstate email transmission for review and signature, such as the Paycheck Protection Program Borrower Application Forms. These documents were fraudulent because, among other reasons, they

5

intentionally misrepresented the average monthly payroll and true number of employees. JENKINS signed and returned the fraudulent Application Forms.

e. E.W. and S.C. also supplied to JENKINS via interstate email, purported employee listing and annual salary for Jenkin's Cleaning Service, Inc and Triangle Property Group, Inc. JENKINS signed and returned these fraudulent documents.

f. E.W. and S.C. also supplied to JENKINS via interstate email, a fraudulent Form 940, and four fraudulent Form 941 documents. The forms were fraudulent because they misrepresented the actual annual and quarterly wages for JENKINS' companies. JENKINS received, signed, and returned the fraudulent and backdated Form 940 and Form 941s.

g. The PPP loan applications were electronically submitted or caused to be submitted by E.W. and S.C. in JENKINS' name, and received through SBA servers located in Oregon, using the fraudulent information described above, by electronically transmitting the information to the lending institution, Harvest Small Business Finance, LLC, which is based in California, via interstate wire transmission.

h. Specifically, the fraudulent PPP applications and supporting

paperwork claimed that both companies each had seven employees and an annual payroll of approximately $700,000, figures designed to yield PPP loans in an amount of just under $150,000. E.W. engineered this result because he would be able to apply for forgiveness from the SBA with minimal paperwork requirements.

    i. JENKINS or another member of the conspiracy acting at E.W.'s direction electronically signed the promissory notes or promises to pay.

    j. The PPP loan monies were then deposited via interstate wire transfer into JENKINS' Wells Fargo account ending in -8672 and Navy Federal Credit Union account ending in -6170, associated with Jenkin's Cleaning Service, Inc. and Triangle Property Group, Inc., respectively.

15. After receiving proceeds from the PPP fraud described above, JENKINS carried out a series of steps orchestrated by E.W. that made it appear as though JENKINS' companies were paying biweekly payroll to its employees.

16. Over an approximate period of four to six weeks, JENKINS wrote checks payable to each of the individuals previously named as purported employees of both companies. Each of the checks contained a memo notation stating a "pay period" and a two-week interval. Collectively, these checks made it falsely appear that each of the check recipients was engaged in work on behalf of JENKINS' companies, and

7

receiving regular wages during each of the stated periods. In reality, none of the check recipients previously received wages from Triangle Property Group, Inc. or Jenkin's Cleaning Service, Inc. comparable to those paid from the PPP proceeds.

17. The purported employees returned some or all of the money back to JENKINS, who then wrote checks to E.W. to compensate him for his assistance in helping JENKINS to fraudulently obtain the PPP loans.

18. E.W., acting on JENKINS' behalf, successfully applied for loan forgiveness from the SBA by falsely attesting that the PPP proceeds were used to pay employee wages.

## THE CHARGE

19. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs of this Criminal Information, and further alleges that JENKINS, E.W., and others known to the United States Attorney, carried out the conspiracy in the manner and means as set forth in those paragraphs.

20. From in or about February 2021 to November 2021, in the Eastern District of North Carolina and elsewhere, the Defendant NATOSIA JEROME JENKINS, and others known to the United States Attorney, did knowingly combine, conspire, confederate, agree, and have a tacit understanding with each other, to commit an offense against the United States: that is, to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain and attempt to obtain money

8

and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, and sounds in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE NOTICE

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any offense charged herein constituting "specified unlawful activity" (as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1)), or a conspiracy to commit such offense, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), as made applicable by 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the said offense.

The forfeitable property includes, but is not limited to, the following:

Forfeiture Money Judgment:

a) A sum of money representing the gross proceeds of the offense(s) charged herein against NATOSIA JEROME JENKINS in the amount of at least $218,658.74.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the

forfeitable property described above.

                    MICHAEL F. EASLEY, JR
                    United States Attorney

BY: _____
                    DAVID G. BERAKA
                    Assistant United States Attorney